# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4196 | **DATE** | 9/10/2004 |
| **CASE TITLE** | US vs. Nathan L. Hill (95 CR 730-1) | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** Hill's motion to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255 is denied. His motions for a new trial and for recusal are also denied. All other pending motions are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | | 48 |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| SCT | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | date mailed notice | | |
| | | 2004 SEP 10 AM 10: 29 | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 03 C 4196 |
| | ) | (95 CR 730-1) |
| NATHAN L. HILL, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
SEP 1 3 2004

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on the motion of Nathan Hill to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, his motion for a new trial pursuant to Fed. R. Crim. Proc. 33, and his two motions for recusal. For the reasons set forth below, the motions are denied.

## BACKGROUND

In 1995, Hill was indicted along with more than 20 codefendants on charges of conspiracy to distribute cocaine, continuing criminal enterprise, drug trafficking, money laundering, and related offenses. Shortly after the indictment issued, Hill fled the United States, seeking refuge in places as diverse as Mexico, Côte d'Ivoire, and the Bahamas before ultimately settling in Conakry, Guinea. After two trials had been

completed for others charged in the indictment, Hill was arrested in Guinea and was returned to this country in early 1998 to face the pending charges along with codefendant Cordell James.

Hill initially retained Thomas Durkin to represent him. As events progressed, particularly with respect to restriction of assets that were suspected to derive from the conduct described in the indictment, Hill's financial wherewithal deteriorated and the court appointed Durkin and his associate, Patrick Blegen, as counsel. Because the trial and preparation therefor promised to be time-consuming and extended, Durkin asked to be relieved from the appointment. Although he was offered other appointed counsel, Hill opted to represent himself with Blegen remaining in the case as standby counsel. Hill apparently envisioned a more expansive role and greater authority for Blegen than would typically be played by standby counsel. At a court proceeding in November 1998, Blegen informed this court of Hill's wishes and it was decided that Blegen would assume a hybrid role with respect to Hill's representation. See Tr. 11/24/1998 at 3-4. Hill expressed his satisfaction with the resulting arrangement at that time. See id. at 4.

At first, Hill sought to accelerate the commencement of the trial but later shifted gears and began requesting multiple extensions of filing dates and the trial date. After a three-week extension from the originally scheduled date, the trial commenced in late March 1999, and the avalanche of evidence occupied nearly two months. Hill testified

at trial; his codefendant James did not. When all was said and done, the jury found Hill guilty on seven counts. No verdict was reached on Count Three, which revolved around a particular drug transaction alleged to have occurred around January 21, 1993. Hill was acquitted of Count Eight, which involved charges of various money laundering activities. In November 1999, Hill was sentenced to life in prison and fined in excess of $8 million. He and James appealed their convictions, which were upheld in United States v. Hill, 252 F.3d 919 (7th Cir. 2001).

In June 2003, Hill filed a motion for relief from his sentence pursuant to 28 U.S.C. § 2255 petition. He has also filed two motions to recuse and a motion for a new trial pursuant to Fed. R. Crim. Proc. 33. Each of these motions is addressed below.

## DISCUSSION

Because the motions to recuse and for a new trial are founded on the same relatively straightforward contentions, we consider them first.

### A. Motions to Recuse

The motions to recuse, as well as the motion for a new trial, are at bottom regurgitations of motions that have already been raised, considered, and decided.[1] The

---

[1] With respect to the issues raised in the motions for recusal, this is so both at the district court and appellate level. Hill included those issues in his appellate brief, and the Court of Appeals considered them undeserving of discussion. Hill, 252 F.3d at 929.

doctrine of the law of the case provides that a court's decision upon a rule of law governs the same issues if they arise at subsequent stages of a case absent a strong reason to depart from the prior decision. United States v. Story, 137 F.3d 518, 520 (7th Cir. 1998). Hill has not advanced any reason to replow the ground covered by this court and the court of appeals, let alone the requisite strong rationale.[2]

Hill's two motions to recuse derive their primary foundation from a case called In re Hatcher. 150 F.3d 631 (7th Cir. 1998). Hill argues that the rationale that led the Seventh Circuit to order recusal in Hatcher applies with equal force to his situation. Thus, says Hill, this court's presiding over his trial created an appearance of impropriety that is prohibited by 28 U.S.C. § 455(b).

Hill's faith in Hatcher is misplaced. The recusal in Hatcher was ordered because of that case's intimate connection to an earlier case, United States v. Hoover, 95 CR 508. A careful reading of Hatcher reveals that the Court of Appeals framed the issue in the following manner: "The question here is whether the Hoover case . . . is so closely related to Hatcher's case that our hypothetical reasonable person would question the judge's impartiality." Id. at 638. The indictment charging Hatcher was

---

[2] Relatedly, we note that Hill has shown a tremendous propensity to file duplicative motions and requests without any good reason to expect that he will achieve different results. Any instances of this practice in the future that are not accompanied by convincing reasons that the law of the case does not apply will be met with summary dismissal.

one of three virtually identical indictments that came out of one investigation.  See id. at 632.  The appellate court concluded that the separation of the Hoover and Hatcher proceedings was formal, not substantive, such that the indictments in the two cases were functionally one.  Id. at 638.

Even the most cursory comparison of the indictment in this case with those in Hoover and Hatcher reveals none of the similarities upon which the Seventh Circuit relied in concluding that the latter two were in essence one proceeding.  See id. at 633-34, 638.  The tangential connection between this case and that prosecution is tenuous at best, and certainly nowhere near strong enough to qualify as "the rare case where the earlier proceedings were so close to the case now before the judge" that recusal was required under § 455(b).  See id. at 638.  Hill's assumption that Hatcher controls is simply wrong, and the motions to recuse are denied.

## B. Motion for a New Trial

Relying on the same circumstances that underpin his motions to recuse, Hill requests a new trial based upon his discovery of "new" evidence in the form of transcripts from the Hoover trial recently given to him by a fellow inmate.

First and foremost, we note that Fed. R. Crim. Proc. 33 provides that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty."  The jury rendered its verdict of guilt on

May 24, 1999. The instant motion for a new trial, filed in June 2003, was more than a year late for the three-year deadline. See, e.g., United States v. Ross, 372 F.3d 1097, 1105 n.6 (9th Cir. 2004). As such, the motion is untimely presented and is denied for that reason.

Second, this motion, like the motions to recuse, implicates the law of the case. This is at least the second time Hill has moved for a new trial on these same grounds, so even if he had made the instant motion within the three years allowed by Rule 33, he has not provided any compelling rationale to reconsider what has come before.

Furthermore, even if the motion had been timely filed and presented issues that had not been previously ruled upon, Hill's chances of obtaining a new trial would be slim to none. Motions for a new trial based on newly discovered evidence are not favored and are viewed with the utmost caution. See United States v. Goodwin, 770 F.2d 631, 639 (7th Cir. 1985). A grant of a new trial is appropriate only in extreme cases. See United States v. Linwood, 142 F.3d 418, 422 (7th Cir. 1998).

To justify the need for a new trial to present newly discovered evidence, a defendant must show that he or she did not become aware of the evidence before the trial ended and could not, through due diligence, have discovered the evidence during the pendency of the trial. See United States v. Gillaum, 372 F.3d 848, 858 (7th Cir. 2004). The reasons for these requirements are obvious; a trial is meant to provide the

factfinder with the fullest amount of admissible evidence upon which to base a verdict. Neither party can be permitted to play just a few of the cards in its hand the first time around, while keeping an ace in the hole to be thrown down only in the event of defeat. In addition to showing that evidence is truly "newly discovered," a defendant must show that the new evidence is material to an issue that was decided during the trial. Id. Finally, and perhaps most importantly, a defendant must show that, in the event of a new trial, the new evidence is so powerful that it will probably lead to an acquittal.

The transcripts Hill claims he only recently discovered were a matter of public record during his trial and even before. In addition, as the second motion for a new trial makes clear, Hill was aware of the substance of his claims for a minimum of three years and eight months before he filed the instant motion, even if he did not have this particular record of their existence.[3] Tr. 10/19/99, at 8-9; Docket, Docs. 1102, 1111. Thus, Hill's claim that he has only recently unearthed a potential basis for relief is at best counterfactual and at worst disingenuous. Moreover, the evidence to which Hill draws attention was not material to any of the issues at his trial; the specific argument he makes is wholly irrelevant to the issues the jury was asked to decide. Even if we

---

[3] Hill appears to believe that the transcripts are significant because, up until now, he had no proof that the events he discusses actually occurred. This is irrelevant; there has never been any dispute that the events Hill discusses occurred. The only question has been whether they have any legal effect; the answer has always been that they do not.

were to assume that the ownership of the money discussed within the transcripts was in dispute, no reasonable jury could see that issue as the difference between conviction and acquittal for Hill, given the mountain of other proof against him provided by the government's case and his own testimony.

It is incumbent upon Hill for purposes of this motion to show each and every one of the four factors described above before a new trial could be possible. See id. He has shown none, so the motion would have no merit even if he had filed it on time, for the first time.

## C. Motion to Vacate, Set Aside, or Correct Sentence

Finally, we turn our attention to the most substantial of Hill's pending motions: his § 2255 motion.[4] Relief under § 2255 is limited to situations where a conviction or sentence is founded in "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of

---

[4] Since the briefing on the § 2255 motion was completed, Hill has filed several miscellaneous motions and supplemental submissions he labels "amendments." To the extent that they merely add to issues already presented in the petition, they are unacceptable because they were filed after the expiration of the briefing schedule. They also add no substance to the arguments Hill had already made. To the extent that they raise new issues, they are subject to the one-year statute of limitations applicable to § 2255 petitions and constitute second or successive petitions, which cannot be filed without prior authorization from the court of appeals, and there is no indication that Hill has obtained the same. Accordingly, the substance of the "amendments" is not considered within this opinion.

justice." Bischel v. United States, 32 F.3d 259, 263 (7th Cir. 1994). A grant of a

§ 2255 motion is the rare exception, not the general rule. See Prewitt v. United States,

83 F.3d 812, 816 (7th Cir. 1996); United States v. Kovic, 830 F.2d 680, 683 (7th Cir.

1987). When reviewing a § 2255 motion, the district court must review the record and

draw all reasonable inferences in favor of the government. See Carnine v. United

States, 974 F.2d 924, 928 (7th Cir. 1992). Because Hill is not represented by counsel,

his motion must be read liberally. Blake v. United States, 841 F.2d 203, 205-06 (7th

Cir. 1998).

The motion[5] puts forth ten grounds for relief: involuntary waiver of Hill's Sixth

---

[5] In his reply, Hill contends that the government is trying to pull the wool over the court's proverbial eyes by referring to the § 2255 as a "petition," implying that Hill is seeking a writ of habeas corpus rather than proceeding under § 2255. While we do not detect any of the veiled insidiousness that Hill apparently spies in the government's use of the term, we are fully cognizant that Hill is proceeding via § 2255 and not seeking the Great Writ. Indeed, that avenue would not be available to him here for two reasons. First, an application for a writ of habeas corpus must be directed at a court within the same district as the place of the prisoner's confinement. 28 U.S.C. § 2241(a); Padilla v. Rumsfeld, ___ U.S. ___, 124 S. Ct. 2711, 2721–24 (2004). Hill is incarcerated in Leavenworth, Kansas, well outside this court's jurisdictional limits for habeas purposes. Second, habeas relief can be sought by a federal prisoner only to the extent that the remedy achievable under § 2255 is not adequate or effective to test the legality of the prisoner's detention. 28 U.S.C. § 2255 ¶ 5. Because Hill's potential for § 2255 relief has not been determined until now, he would be unable to pursue a writ of habeas corpus prior to the issuance of this decision. As a practical matter, we are well aware that the terms "motion," "application," "petition," etc., are often used interchangeably within the context of § 2255 proceedings. Hill may rest assured that we will apply the appropriate legal framework to the instant matter, regardless of the
(continued...)

Amendment right to counsel; violation of his Fifth Amendment right to testify in his own defense; violation of his Fifth Amendment right against self-incrimination; failure of the indictment to properly charge an offense; denial of Fifth Amendment due process in a variety of ways; deficient jury instructions; denial of a motion to continue the trial date; inability to pay for counsel of his choice because of threats made to his family members who tried to offer funds; interference with his ability to compel witnesses to testify in his defense; and failure of his counsel to submit a particular jury instruction.

## 1. *Procedural Default*

First, we must address the government's argument that Hill has procedurally defaulted on his claims, obviating consideration of their merits. When a defendant fails to raise an available claim during direct review, the doctrine of procedural default normally will bar its consideration in a § 2255 motion. <u>Galbraith v. United States</u>, 313 F.3d 1001, 1006 (7th Cir. 2002). A district court need not reach the merits of an issue in a § 2255 proceeding unless it has been raised in a procedurally appropriate manner. <u>See</u> <u>Williams v. United States</u>, 805 F.2d 1301 (7th Cir. 1986). A § 2255 motion is

---

[5] (...continued)
labels either party employs. There is simply no danger that we would be duped by an effort to "cunfuse [sic] the application of approiate [sic] jurisprudence as it should apply to this pending motion." Reply, at 2.

neither a recapitulation of nor a substitute for a direct appeal. See McCleese v. United States, 75 F.3d 1174, 1177 (7th Cir. 1996). This general rule is subject to two exceptions: where a defendant can satisfy the "cause and prejudice" test of Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506-07 (1977), and where a defendant can show a fundamental miscarriage of justice. See Sawyer v. Whitley, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518-19 (1992).

*a. Cause and Prejudice*

To proceed under the first exception, a defendant must show that the failure to present a given issue previously was the result of circumstances outside the defendant's control ("cause") and that the errors of which he complains created actual and substantial disadvantage, such that his entire trial was tainted with error of constitutional proportions ("prejudice"). See, e.g., Coleman v. Thompson, 501 U.S. 722, 753, 111 S. Ct. 2546, 2566 (1991); United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982).

It is not enough for a defendant to make conclusory allegations of cause and prejudice; the burden can only be satisfied by a specific showing of their existence. See, e.g., Norris v. United States, 687 F.2d 899, 900–04 (7th Cir. 1982). Here, Hill counters the government's assertion of procedural default by spewing a catch-all litany of responses, many of which are nonsensical, inaccurate, or contradictory. Aside from

that, it is virtually impossible for Hill to show cause in this case for decisions made at trial, since they were all within his control by virtue of his self-representation. His failure to raise any of the issues presented in his motion at time of trial falls squarely at his feet. Since there is no inequity that results from requiring a defendant to bear the risk of attorney error that results in a procedural default, see Murray v. Carrier, 477 U.S. 485, 488, 106 S. Ct. 2639, 2645 (1986), there certainly cannot be any unfairness in that same defendant facing the consequences of decisions made during self-representation. Because Hill fails to show either cause for or prejudice from his failure to earlier raise these issues, this exception does not apply.

b. *Fundamental Miscarriage of Justice*

Under the second exception, if a defendant can show a fundamental miscarriage of justice that would result if his claims went unexamined, procedural default will not prevent a court from addressing the merits of a § 2255 motion. See Sawyer, 505 U.S. at 339, 112 S. Ct. at 2518-19. While Hill argues that this exception applies to him, he overestimates the range of instances that can qualify as a "fundamental miscarriage of justice." In this context, the phrase has been construed to apply only to situations in which a defendant can demonstrate that he is actually innocent of the crime for which he was convicted. See Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003).

Hill asserts that the fundamental miscarriage of justice exception applies to his claims, but in doing so, he does not allege that he is actually innocent of the crimes of which he was convicted. In fact, Hill explicitly admitted criminal behavior in his trial testimony. Tr. 5/11/99 at 4361, l. 18. Moreover, he implicitly disclaims any allegation of actual innocence elsewhere in his petition; in discussing the fallout from his decision to testify, he states that his testimony as well as the government's cross-examination established the "chain of evidence" that led to the verdicts of guilt. See Motion at 11, ¶ 15. Thus, despite his arguments to the contrary, this exception does not apply either. Accordingly, we need not consider the merits of his defaulted claims.

## 2. Contentions Not Subject to Procedural Default

That being said, four of the issues Hill raises in his motion conceivably are not subject to procedural default despite Hill's failure to raise them on appeal and his failure to establish either of the above-described exceptions. They are ineffective assistance by his appellate counsel, ineffective assistance by his standby counsel to the extent that the deficient performance is not apparent from the record at trial, the sufficiency of the indictment, and a lack of personal jurisdiction as to him. See Massaro v. United States, 538 U.S. 500, 508, 123 S. Ct. 1690, 1696 (2003) (ineffective assistance of trial counsel); Bond v. United States, 1 F.3d 631, 635 (7th Cir. 1993) (ineffective assistance of appellate counsel); United States v. Esposito, 771 F.2d 283,

288 (7th Cir. 1985) (sufficiency of the indictment); <u>Macchione v. United States</u>, 205

F. Supp. 2d 888, 890 (N.D. Ill. 2002) (personal jurisdiction).

*a. Ineffective Assistance of Appellate Counsel*

Hill does not make a distinct argument for relief based on alleged incompetence

of his appellate counsel. Because he is *pro se*, we give him the benefit of the doubt that

he intended to make a separate contention that his attorney's failure to raise the issues

within his motion stood between him and reversal of his conviction.[6]  He appears to

argue that his attorney's performance fell below the acceptable threshold of

professional competence by not raising the issues contained within his petition.  Hill

is subject to the consequences flowing from his attorney's actions during the pendency

of the appellate proceedings unless his counsel's actions satisfy both prongs of the

"cause and prejudice" test of <u>Strickland v. Washington</u>. 466 U.S. 668, 104 S. Ct. 2052

(1984).

Although the <u>Strickland</u> test employs the same terms as the test for procedural

default under <u>Wainwright</u>, the meaning of the words differs in the context of a claim

of ineffective assistance of counsel.  To satisfy the cause prong, a defendant must

---

[6] We do not consider the other potential argument that would center on Hill's appellate attorney, namely that it provides the cause for his failure to raise his defaulted claims on appeal.  Because Hill represented himself at trial and all of the claimed defects arose before or during the trial, Hill cannot shift the blame now to his appellate counsel.

identify acts or omissions by counsel that, in light of all the circumstances of the case, fell below the threshold of acceptable professional conduct. See id. at 690, 104 S. Ct. at 2066. If the defendant can supply specifics that counsel did not exercise reasonable professional judgment or render adequate assistance despite the strong presumption to the contrary, the court must consider whether there is a reasonable probability that the attorney's errors so negatively impacted the ultimate judgment against the defendant that it can be characterized as prejudice. See id. at 694, 104 S. Ct. at 2068.

Appellate counsel is under no professional obligation to make every imaginable argument; to do so detracts from arguments that counsel concludes have a better chance of succeeding before the court of appeals. See Engle v. Isaac, 456 U.S. 107, 133-34, 102 S. Ct. 1558, 1574-75 (1982). As long as the result of this winnowing process falls within the wide range of professionally acceptable possibilities that were available to Hill's appellate attorney, his claim of ineffective assistance will fail.

On appeal, Hill's attorney advanced various arguments pertaining to the calculation of Hill's sentence, the jury instructions that were given, sufficiency of the continuing criminal enterprise charge, and recusal. Though not ultimately successful, some of these issues were arguable, and counsel cannot be said to have fallen asleep at the wheel by choosing to bring them to the attention of the Court of Appeals and excluding those that Hill now advances. Thus, Hill cannot make it past the first prong

of <u>Strickland</u>, and without constitutionally deficient performance in the first instance, there can be no prejudice suffered as a result of that performance. Thus, there was no violation of Hill's Sixth Amendment right to counsel by his appellate attorney.

### b. *Ineffective Assistance of Hybrid Counsel*

Hill's next claim professes that Blegen exceeded the limits of his authority as hybrid counsel by calling Hill as a witness, thereby usurping Hill's control over the content and presentation of his defense. To support his argument, Hill relies solely on a statement by the Supreme Court in <u>McKaskle v. Wiggins</u> that a pro se defendant must be able "to control the organization and content of his own defense." 465 U.S. 168, 174, 104 S.Ct. 944, 949 (1984). While this is certainly true, the teaching of <u>McKaskle</u> does not end there. The case also states that a *pro se* defendant cannot object to counsel's involvement where the defendant expressly approved it. <u>Id.</u> at 182, 104 S. Ct. at 953. More specifically, the *pro se* defendant's invitation for counsel to participate in part of the defense defeats a later argument that he was not allowed to control the defense. <u>Id.</u> A course of action need not be expressly authorized; a defendant's acquiescence to counsel's participation can likewise undermine a contention that counsel impermissibly interfered. <u>Id.</u> Under such circumstances, counsel's involvement is presumed to be within his scope of authority unless and until the *pro se* defendant requests to silence him. <u>Id.</u>

There is no indication that Blegen prevented Hill from presenting the case in the manner in which Hill deemed best. While he was represented by counsel, on numerous occasions Hill wrote letters to the court and filed motions on his own behalf. Tr. 5/18/98 at 3,7; Tr. 7/15/98 at 17,19; Tr. 8/20/98 at 2,3,4,10; Tr. 10/5/98 at 2. He also voiced several objections during proceedings of codefendants. Tr. 9/15/98 at 14-16. By all accounts, Hill was calling the shots. He gave no intimation that Blegen was attempting to railroad him into courses of action he did not wish to pursue. In fact, in his closing argument, Hill characterized Blegen as "brilliant," stated that he loved Blegen, and remarked that Blegen had "worked hard" for Hill's life. Tr. 5/18/99 at 5207, ll.7-10. It is difficult to square those comments with Hill's current averment that Blegen was blatantly disregarding Hill's wishes in defending the case.

At the tail end of the trial, Hill had still not firmly decided whether he would take the stand. When asked if the defense was prepared to rest, Hill asked the court if he could have overnight to contemplate whether or not to testify. Tr. 5/10/99 at 4223-25. We allowed him the requested time to make up his mind. Tr. 5/10/99 at 4223-25. In Hill's presence, Blegen then noted to the court that Hill was still undecided about testifying or not. Tr. 5/10/99 at 4261. Hill did not contradict Blegen's statement. Following this exchange, the court raised the possibility of waiting two days to resume trial, rather than continuing the next day. Tr. 5/10/99 at 4261-75.

At that time, Hill did not indicate that he needed more time to adequately prepare his testimony with Blegen. Tr. 5/10/99 at 4261-75.

The following morning, May 11, 1999, the court asked the parties if they were ready to proceed, to which only one of Hill's codefendants responded. Tr. 5/10/99 at 4278. The jury entered the courtroom; the court again specifically asked the defense if they were ready to proceed; Hill was still silent. Tr. 5/10/99 at 4278. Blegen then called Hill as the defense's next witness. Tr. 5/10/99 at 4278. Hill now alleges that he and Blegen had not previously discussed the substance of Hill's testimony. According to Hill, Blegen's ignorance led him to ask inappropriate questions that brought out information Hill did not wish to put before the jury.

Hill's contentions are baseless. First, the fact that Hill did not speak up shortly before testifying in response to the required form of testimony supports the conclusion that Hill acquiesced to Blegen's involvement in calling him to the stand and eliciting his testimony. See McKaskle, 465 U.S. at 182-83, 104 S. Ct. at 953. Second, when Hill was instructed (as he had been earlier warned) that he could not give his testimony in the narrative, Blegen proceeded with a direct examination that brought out elements of the defense theory Hill wished to advance. That Hill believes his message would have been more effective if delivered in narrative fashion is of no moment. The Fifth Amendment does not guarantee a criminal defendant an opportunity to pontificate from

the witness stand, so whatever delegation of authority Hill thought he had made to Blegen to elicit an uninterrupted soliloquy was empty from the get-go. Blegen complied with this court's rulings and the rules of evidence while still eliciting points that Hill wanted to make and upon which he relied in his closing argument. This is effective representation in the face of the significant obstacles Hill placed in the path of his defense, not the woefully deficient performance Hill perceives.

Hill ignores the fact that counsel's limited awareness of the content of his testimony directly resulted from Hill's own failure to apprise Blegen of his intention to take the stand or to take advantage of the opportunity to take extra time to adequately prepare himself and Blegen for what lay ahead. He apparently believed that he could traverse the minefield into which he ran headlong and emerge unscathed. He unquestionably had the right to make that decision, and he just as unquestionably must accept responsibility for the consequences of his choice. See Ohler v. United States, 529 U.S. 753 (2000); United States v. Saunders, 359 F.3d 874, 877 (7th Cir. 2004).

Hill's claim of ineffective assistance from Blegen is groundless and does not warrant § 2255 relief.

*c. Sufficiency of the Indictment*

Next, Hill challenges the sufficiency of the indictment filed against him. The government counters that Hill cannot take issue with the indictment because he faces

a double procedural default on this issue. This is certainly true with respect to the indictment's clarity, i.e., Hill's ability to understand the allegations it contained. See United States v. Frady, 456 U.S. 156, 162, 102 S. Ct. 1584, 1591–92 (1982). However, to the extent that Hill's motion can be construed to allege that the indictment failed to state an offense at all, he is not precluded from seeking § 2255 relief; the argument that an indictment fails to charge an offense is subject to review at any stage. See United States v. Esposito, 771 F.2d 283, 288 (7th Cir. 1985).

"[A]n indictment not challenged before trial will be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." United States v. Mosley, 786 F.2d 1330, 1334 (7th Cir. 1986) (internal quotation omitted). In reviewing the sufficiency of an indictment, a court should consider the challenged count or counts as a whole and should refrain from hypertechnical readings. See id. An indictment must be read to include facts that are necessarily implied by the allegations made therein. See id. Even if an essential averment in an indictment is faulty in form, if the element may by fair construction be found within the text of the charge, the indictment is sufficient to state an offense. See id.

An indictment should state all of the elements of the offense charged and inform the defendant of the nature of the charge so that he may prepare a defense. See id.;

Banks v. United States, 239 F.2d 409, 410 (7th Cir. 1957).[7]  Though the essential

elements must be charged, the indictment need not mimic the statutory language or use

any particular words or phrases.  United States v. Weatherspoon, 581 F.2d 595, 600

(7th Cir. 1978).  Rather, the essential elements may be alleged in any form that

substantially states them.  Id.

Hill argues that the incorporation by reference of some counts into others in the

second superseding indictment rendered the charges against him so incomprehensible

that they cannot fairly be read to state an offense.[8] Although the indictment in this case

is certainly voluminous and complex, it tracks the language of the applicable statutes

and lays out the predicate factual allegations that are necessary to establish a violation.

The counts that incorporate others by reference are not based upon mutually exclusive

offenses, as Hill seems to believe, so there is no impropriety in the indictment

reflecting their interrelated nature.

---

[7]  A legally sufficient indictment must also enable the defendant to plead the
judgment as a bar to any later prosecution for the same offense.  See Mosley, 786 F.2d
at 1334.  Because this requirement is not implicated in this case, we do not include it
in our discussion.

[8]  We note that Fed. R. Crim. Proc. 7(c), which directly addresses the required
contents of an indictment, specifically endorses incorporation of allegations by
reference.

With the assistance of attorney Blegen, Hill comprehended enough of the indictment to be able to prepare a coherent defense that he presented over the course of a two-month trial. Hill's conduct at and his presentations during trial clearly demonstrated that he understood the nature of the crimes of which he was accused. Fairly construed, the indictment served its core function of stating a cognizable charge.

*d. Personal Jurisdiction*

Hill's final potentially nondefaulted claim revolves around his contention that this court did not have personal jurisdiction over him and therefore violated his due process rights under the Fifth Amendment by conducting his criminal trial. Claims of a jurisdictional defect in § 2255 petitions are not subject to the procedural default rule. See Macchione v. United States, 205 F. Supp. 2d 888, 890 (N.D. Ill. 2002). However, relief under § 2255 is only available if the trial court is guilty of an error that is either jurisdictional or constitutional, which in turn creates a fundamental defect that inherently results in a miscarriage of justice. See United States v. Joiner, 847 F. Supp. 604, 607 (N.D. Ill. 1994). In Hill's case, no such error occurred.

United States district courts have original and exclusive jurisdiction over all offenses committed in violation of federal criminal laws. 18 U.S.C. § 3231; United States v. Wren, 363 F.3d 654, 660 (7th Cir. 2004). Hill appears to believe that this court's jurisdiction over his person is determined by his location at the time of arrest,

but his understanding is defective. Our ability to assert jurisdiction over him was established at the time he violated federal criminal statutes within the geographic boundaries of the Northern District of Illinois. He has pointed to no later event that could have divested us of jurisdiction. The evidence of Hill's criminal activity in and around Chicago provides ample foundation for our exercise of personal jurisdiction.

It appears from the substance of Hill's arguments that he also intended to challenge the manner in which he was detained and arrested in Guinea. For over a century, the Supreme Court has consistently held that the manner in which a defendant who has fled to a foreign jurisdiction is brought to trial does not affect the ability of the government to try him. The Ker-Frisbie doctrine, as this rule has come to be known, states that "the power of a court to try a person for a crime is not impaired by the fact that he has been brought within the court's jurisdiction by reason of forcible abduction." Matta-Ballesteros v. Henman, 896 F.2d 255, 260 (7th Cir. 1990) (citing Frisbie v. Collins, 342 U.S. 519, 522 (1952) and Ker v. Illinois, 119 U.S. 436 (1886)). While notions of due process have been expanded since Ker and Frisbie were decided, the Supreme Court has consistently reaffirmed the doctrine. Matta-Ballesteros, 896 F.2d at 260.[9]

---

[9] Although the Second Circuit has carved out an "exception" to the Ker-Frisbie doctrine, where a defendant could prove that "torture, brutality, and similar outrageous
(continued...)

Although illegally obtained evidence can be excluded from a criminal trial, the same does not hold true for a defendant forcibly brought before a court to answer to criminal charges. See United States v. Alvarez-Machain, 504 U.S. 655, 670, 112 S. Ct. 2188, 2197 (1992); United States v. Crews, 445 U.S. 463, 474 (1980). "There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." Frisbie, 342 U.S. at 522, 72 S. Ct. at 511-12. Therefore, Hill's allegations of abuse at the hands of the Guinean police are immaterial to the propriety of his trial and do not lead him to relief under § 2255.

Looking beyond his arrest and detention, Hill also claims that he was entitled to an extradition hearing before he could be properly compelled. This contention suffers from an enormous flaw, namely the lack of an extradition agreement between the United States and Guinea at the time of Hill's arrest. There is no formal process that must be followed by American or Guinean officials in a case such as this one. In

---

[9] (...continued)
conduct"during an international abduction and detention violated his due process rights, the Seventh Circuit has not followed suit. See Matta-Ballesteros, 896 F.2d at 263; Lujan v. Gengler, 510 F. 2d 62 (2d Cir. 1975); United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974). Neither can the conduct Hill describes in his complaint be deemed to be so egregious as to fall within the exception; no court has ever found conduct that rises to the level necessary to require the United States to divest itself of jurisdiction. See Matta-Ballesteros, 896 F.2d at 261.

addition, even if a treaty had been in place, Guinean authorities chose to turn Hill over to American officials and lodged no protest against his removal to the United States. Such action on the part of the surrendering country would not trigger a treaty violation and is furthermore unreviewable in our courts. See Johnson v. Browne, 205 U.S. 309, 316 (1907). This result is consistent with a concern for international comity. It would be highly inappropriate for an American court to second-guess a determination made by a foreign sovereign. See Sahagian v. United States, 864 F.2d 509, 514 (7th Cir. 1988). In any event, the lack of any extradition agreement means that the method employed in achieving Hill's return had no effect on our ability to exercise jurisdiction over Hill's person. See Alvarez-Machain, 504 U.S. at 662, 112 S. Ct. at 2193.

In sum, none of Hill's nondefaulted claims warrant a § 2255 remedy.

## 3. Procedurally Defaulted Issues

As discussed above, the remaining claims set out in Hill's § 2255 motion are procedurally defaulted. Even if there were not, none merits the relief he requests.

### a. Voluntariness of Decision to Proceed Pro Se

Hill's first defaulted argument revolves around his decision to represent himself. He contends that 1) his waiver of his right to counsel was involuntary and 2) the court should have been aware of the involuntary nature of his actions. Hill contends that his decision to represent himself was the direct result of an involuntary waiver of his Sixth

Amendment right to counsel. He argues that this alleged involuntarily waiver of counsel violated his right to effective assistance of counsel under the Sixth Amendment. He also claims that denial of his Fifth Amendment right to fundamental fairness under the due process clause because of this alleged involuntary waiver.

In support of these claims, Hill first relies upon his use of the word "involuntary" in the caption of his motion to proceed *pro se* and insists that the court never determined whether his decision was in fact voluntarily reached. He also points to his subjective belief that he was not receiving effective assistance of counsel, buttressed by the government's motion to disqualify his initial trial counsel and this court's appointment of his second attorney.[10]

Neither of these arguments even gets off the ground.

Hill overestimates the power of the lone word "involuntary" within his motion to proceed *pro se* and its potential effect on the determination of voluntariness of his waiver of his Fifth and Sixth Amendment rights in this context. The voluntary nature of a waiver is determined from the totality of the circumstances; there are no magic words that will do or undo a waiver. See United States v. Egwaoje, 335 F.3d 579, 585 (7th Cir. 2003); Hill, 252 F.3d at 928-29. If the record establishes that the defendant

---

[10] Hill also claims that he premised his decision to forego trained counsel on outrageous government conduct. Because this argument is specifically addressed in section g below, we do not treat it separately here.

knew what he was doing and made his choice with his eyes open, that is sufficient for constitutional purposes. See Faretta v. California, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975).

Hill's waiver of his right to counsel has already been deemed knowing and intelligent, so he seizes on the only word not specifically ruled out for him yet: voluntary. However, he fails to recognize that an extensive discussion topic with a defendant, though not explicitly addressing a given subtopic, have the same practical effect as a direct explanation. See United States v. Kosmel, 272 F.3d 501, 506 (7th Cir. 2001) (extensive discussions with defendant, while not explicitly addressing an issue, had same practical effect as direct explanation).

Webster's Third New International Dictionary defines voluntary as "proceeding from the will, produced in or by an act of choice," "performed, made, or given of one's own free will," "done by design or intention: not accidental,"acting of oneself: not constrained, impelled, or influenced by another." Webster's Third, at 2564. The transcript from October 5, 1998, shows that Hill was provided with all of his available options when he decided to forego representation by a trained attorney and manage his own defense. Tr. 10/5/98, at 3-12. He was free to choose any of the alternatives presented; none was favored and he was not pressured to choose one over another. If anything, he was urged not to pursue the course of action he ultimately chose. His

decision to proceed despite the warnings of the difficulties he would encounter underscores his independent and unforced decisionmaking. Regardless of the label Hill affixes to his choice within his filings, the substance of the events that transpired in this case unequivocally indicates that Hill's choice was freely and voluntarily made, without any undue influence from outside sources.

"[T]he requirement that a waiver of counsel be voluntary 'does not mean that the decision must be entirely unconstrained. A criminal defendant may be asked, in the interest of orderly procedures, to choose between waiver and another course of action as long as the choice presented to him is not constitutionally offensive.'" United States v. Davis, 604 F.2d 474, 483 (7th Cir. 1979) (quoting Maynard v. Meachum, 545 F.2d 273, 278 (1st Cir. 1976)). Contrary to Hill's assertions, he did not find himself caught between Scylla and Charybdis. The fact that he did not think his choice would bring him to this point does not make that choice any less freely made.

Hill also argues that he was so suspicious of the criminal justice system as a whole because of his experiences leading up to his decision to represent himself that his only available option was to go it alone. If we were to accept this argument, the only way to repair the constitutional infirmity would be to provide Hill with a custom-made trial mechanism that was removed from prior events to a degree acceptable to his personal predilections. The Sixth Amendment guarantees that all criminal defendants

will be treated fairly and equally at trial, not that the courts will tailor the trial process until it rests well inside the defendant's subjective comfort level. Hill has shown no evidence of coercion on the part of the prosecutor or this court; his subjective suspicions are not the stuff of undue outside influence. See Hill, 252 F.3d at 924, 929.

*b. Refusal to Allow Hill to Testify in the Narrative*

Hill next moves to the circumstances surrounding his trial testimony, in particular this court's refusal to allow him to testify in narrative form. In essence, he argues that the Fifth Amendment entitles a criminal defendant to testify in whatever manner he chooses, and if the testimony does not go as the defendant plans, he can strike the testimony from the record and escape cross-examination. This understanding is, to say the least, overly broad. A refusal to allow a defendant to testify in his desired manner runs afoul of the Fifth Amendment only if the denial affects the defendant's ability to testify to such an extent that he or she is essentially unable to describe any of the circumstances relevant to his or her defense. See Rock v. Arkansas, 483 U.S. 44, 57 (1987); United States v. Hach, 162 F.3d 937, 944 (7th Cir. 1998). Though the right to testify is an essential component of due process, it is not without boundaries. Rock, 483 U.S. at 51; Hach, 162 F.3d at 944. Whether or not a witness may testify in narrative form is an evidentiary matter in which the trial court is given considerable deference. United States v. Pless, 982 F.2d 1118, 1123 (7th Cir. 1992). A trial court

is authorized to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . .." Fed. R. Evid. 611(a). Rule 611(a) authorizes a district judge to permit to deny testimony in narrative form, as opposed to question-and-answer form. <u>Pless</u>, 982 F.2d at 1123.

Prior to trial, Hill considered testifying. He sought, if he chose to testify, to deliver his testimony in narrative form. Following objection by the government, the court advised Hill that his testimony must be delivered by question and answer. Tr. 10/5/98 at 8. Hill stated that he understood this limitation. Tr. 10/5/98 at 8.

At trial, Hill had apparently forgotten this admonition, since Blegen's first question to him on the stand called for a narrative response. Tr. 5/11/99 at 4279. The government immediately objected, and the objection was sustained. <u>Id.</u> When told he would have to employ the typical question-and-answer format of a direct examination, Blegen informed the court that he had not had an opportunity to discuss Hill's testimony at length with him, and to adhere to the usual methods would place him in an "impossible situation." <u>Id.</u> at 4280, 4282–83. Despite this, Blegen continued with his questioning of Hill, who testified that he ceased participation in drug dealing and withdrew from any conspiracy by 1990 because he was threatened and extorted by gangs. <u>Id.</u> at 4287-91. Hill testified that he never sold drugs to gang members. <u>Id.</u> at 4292. He also testified that money he spent after 1991 was money he accumulated

from before 1991. Id. at 4350-64. Hill testified that the other members of the alleged conspiracy continued dealing in cocaine after Hill stopped. Id. at 4294-98, 4300-03, 4305-06, 4341-42. He informed the jury that his money did not come from dealing drugs but rather from legitimate businesses he pursued after quitting the drug business, such as auto racing, buying and selling HUD properties, a fish business, buying and selling diamonds and gold in Africa, a jewelry store in the Bahamas, and buying and exporting coffee beans. Id. at 4291, 4293, 4326, 4328-31.

These events demonstrate that Hill was able to present the jury with essential components of Hill's theory of defense. Though properly limited, Hill's Fifth Amendment right to testify survived intact. Under Rock and Hach, nothing more was required.

*c. Self-Incrimination*

Placing a slight twist on the previous claim, Hill next asserts that his Fifth Amendment protections against self-incrimination were unlawfully removed during his testimony and the government's cross-examination. This claim is related to the charge he lodges against Blegen, but rather than placing his target on his attorney's performance during direct examination, he sets his sights here on the prosecutor and the court.

Like the related claim, this one has no merit. Hill's exposure to self-incrimination originated from his own desire to tell his story to the jury from his own lips. Having given this goal priority, he "cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute." See Brown v. United States, 356 U.S. 148, 155-56, 78 S. Ct. 622, 627 (1958); Neely v. Israel, 715 F.2d 1261, 1263-64 (7th Cir. 1983). The court in Brown went on to note that allowing this type of game would transform the Fifth Amendment into a "positive invitation to mutilate the truth a party wishes to tell" by eviscerating the government's ability to expose perjurious testimony through the adversarial process. Brown, 356 U.S. at 156, 78 S. Ct. at 627. Once Hill assumed the witness stand, his Fifth Amendment rights were not the sole judicial interest at stake; the government's interest in putting on its case and the duty of the courts to ascertain truth come into play. See id. Thus, Hill cannot reasonably expect that his Fifth Amendment rights would have the scope that he argues they did during his testimony. His additional assertion that he had an absolute right to strike his testimony is erroneous and does not merit discussion. See id. at 156 n.5, 78 S. Ct. 627 n.5.

*d. Miscellaneous Due Process Violations*

Ground V of Hill's petition, which alleges a mishmash of due process violations, is reminiscent of several incomplete jigsaw puzzles whose pieces have landed in a tumultuous heap after being tossed into a strong wind. We have neither the inclination nor the obligation to parse through his underdeveloped stabs at constitutional arguments to determine whether a coherent picture could possibly emerge. It is Hill's burden to demonstrate an entitlement to the relief he requests, and that burden is not satisfied by half-formed thoughts strung together in a barely coherent mess. Based on narrow scope of possible bases for relief under § 2255, Hill's "throw in everything and the kitchen sink" approach is singularly inappropriate.

*e. Elements Missing from Jury Instructions*

Hill next sets his sights on the instructions given to the jury on the conspiracy and continuing criminal enterprise counts of the indictment.

With respect to Count One, Hill claims that the instruction impermissibly left out the element of an overt act. His understanding of the requirements for this offense is deficient. The Supreme Court has explicitly held that "[i]n order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy." U.S. v. Shabani, 513 U.S. 10, 15, 115 S. Ct. 382, 385 (1994). There is no need to instruct the jury on an issue that the

government does not need to prove to establish a criminal offense. In fact, "[u]nless it is necessary to give an instruction, it is necessary not to give it." Hill, 252 F.3d at 923.

Hill also takes issue with various terms that he claims were not defined within the instructions but should have been. His claim that the term "circumstantial evidence" was not defined for the jury is completely wrong and entirely contradicted by the transcript section he himself cites. At page 5287, lines 13 through 15, the jury was instructed as follows: "Circumstantial evidence is the proof of a series of facts which tend to show whether the defendant is guilty or not guilty." This language is taken verbatim from Instruction 1.05 of the Seventh Circuit Federal Jury Instructions: Criminal. Although use of pattern jury instructions is not mandatory, Hill certainly cannot quibble with the accuracy of this statement of law. Consequently, he cannot claim that the jury was not properly instructed on this issue.

Hill's next challenge looks to the terms "violations" and "felony"[11] as used in the instructions given for Count Two. He ignores the fact that the instruction later details the types of offenses that can be considered in determining whether a defendant has participated in a continuing criminal enterprise: "distribution of a controlled

---

[11] Hill's motion at various places lists these terms as "rotate," "violate," and "felon." Because they appear only as "felony" and "violations" in the portion of the transcript to which he cites, we use only those two word forms.

substance; possession of a controlled substance with the intent to distribute; or, attempted possession of a controlled substance with the intent to distribute." Tr. 5/19/99, at 5304, ll. 19-22; see also Tr. 5/13/99, at 4962-65. Hill apparently believes that jurors would not realize that the phrase "committed a continuing series of at least three or more felony violations of Section 841(a)(1) of Title 21, United States Code" was the equivalent of "committed a continuing series of at least three offenses," which preceded the enumeration of the three types of offenses that could be considered. We do not have such a low opinion of the jurors' cognitive ability and consequently reject Hill's contention that the use of the undefined terms "felony" and "violations" rendered this instruction constitutionally infirm.

Next, Hill sets his sights on the lack of definition of the words "without more" within James' Instruction 14. For starters, the term was used in an instruction that applied only to Hill's codefendant Cordell James. Its inapplicability to Hill was made explicit in its terms and during the jury instruction conference. Tr. 5/13/99, at 5005, ll.16-20, 5006, ll. 2-4. Furthermore, the instruction comes directly out of the Seventh Circuit Pattern Jury Instructions: Criminal; it is Pattern Instruction 6.12. Above all, the term "without more" was used in its ordinary sense to a jury comprised of native speakers of English; there was no need to explain to them meanings of words they already knew.

Lastly, Hill attacks the last sentence of the government's Instruction 14, which states that "[i]f a statement was not made under oath, you may not use it as evidence of the truth of the matters contained in that prior statement." Tr. 5/19/99, at 5291, ll. 14-16. Hill insists that this statement contains an invalid presumption "by giving statements not made under oath no credibility as to the truth of the matters contained in any prior statements." Mot. at 36, ¶ 14. As with his other contentions regarding the jury instructions, Hill is dead wrong. The challenged sentence gives an accurate description of the law of hearsay and its application to statements that are not made under oath. See United States v. Carter, 313 F. Supp. 2d 921, 927 n.5 (E.D. Wis. 2004). There is nothing improper about this instruction or any implication it had for the jury; an accurate statement of law favors neither party over the other.

The other sparse and liminal arguments Hill tosses out are not comprehensible enough to warrant examination. The jury instructions given on the first two counts of the indictment were correct and adequate to provide the jury with the requisite understanding of the applicable law. They provide no basis upon which to conclude that the verdict and resulting sentence were reached in any error, let alone constitutional error.

*f. Denial of Continuance*

Hill's next objection focuses on his claim that he was denied a continuance of the trial date, which unfairly forced him to go to trial unprepared and consequently impinged his rights to due process. This claim is baseless. First, more than a year expired between Hill's initial court appearance and the commencement of the trial. Second, the original trial date was pushed back by almost three weeks, at Hill's request. Third, Hill has not given any explanation of why he was entitled to additional time to prepare his defense beyond the fact that he asked the court to begin the trial in June rather than March. Fourth, Hill has not given any indication of why the additional time was crucial to his defense. Hill received all the process that was due him; the Fifth Amendment does not provide a criminal defendant with an unlimited amount of time to gear up for trial, particularly when other codefendants' rights are impacted. The difference between a three-week continuance and a three-month continuance simply does not add up to a constitutional deprivation in this case.

*g. Alleged Misconduct by the Prosecution and Federal Agents*

Hill's motion levels two charges of misconduct by the prosecution and other law enforcement officials involved in his case. The first claims that federal agents impinged on Hill's right to retain Durkin, the counsel of his choice, by threatening his

family members with charges of money laundering if they attempted to pay for his legal representation.

The government, apparently inadvertently, did not respond to this contention. However, contrary to his apparent belief, Hill does not prevail on that claim by default. He has given no affidavits other than his own to support his allegations. Unsubstantiated allegations of prosecutorial misconduct are not a basis to challenge a conviction or sentence. See United States v. Flood, 965 F.2d 505, 511 (7th Cir. 1992). Moreover, even assuming that agents made contact with Hill's family, that conduct is too far removed from trial proceedings to have had such a colossal impact that § 2255 could be triggered. Finally, there is no indication that Durkin's representation would have made any difference in the face of the mountain of evidence against Hill that was presented at trial, particularly since Hill's self-representation was supplemented by Blegen's assistance. This claim gets Hill no closer to § 2255 relief.

Hill's second claim of misconduct contends that government agents somehow persuaded witnesses whom he intended would testify on his behalf to turn against him in favor of his brother, Toby Hill. This assertion fares no better than its companion. First, none of the actors Hill identifies were federal agents. Toby Hill's decision to give testimony against his brother does not metamorphose him into an agent of the government for purposes of transferring whatever misconduct he may have engaged

in onto the prosecution.  Second, once witnesses are sworn, they are presumed to give truthful testimony.  See United States v. Hall, 854 F.2d 1036, 1040 (7th Cir. 1988). Hill's self-serving statements that his family sold him out to save his brother are insufficient to overcome this presumption.  Finally, Hill had every opportunity to attack the credibility of government witnesses by bringing out biases and inconsistencies during his cross-examination of them.  The jury's verdict indicates that they did not agree with his contention that the government's witnesses were not credible, and their decision must stand.  This ground gives no cause for disturbing Hill's sentence.

*h.  Jury Instruction Regarding Multiple Conspiracies*

The last argument that Hill makes again involves attorney Blegen.  He claims that, during the trial, he asked Blegen to provide him with materials regarding jury instructions that he wished to propose.  According to Hill, Blegen never supplied him with the documents he requested and proceeded to offer a set of instructions that did not include the multiple conspiracies instruction that he insists was a cornerstone of his defense.[12]  However, when asked whether he wished to participate in the jury instruction conference, Hill both declined to attend and said nothing about the

---

[12] Because Hill knew all of the relevant facts underlying this claim at the time of trial, this aspect of his ineffective assistance arguments is not subject to the exception outlined in Massaro.  As a result, it is procedurally defaulted and discussed within this section.

allegation that he now advances. Tr. 5/12/1999, at 4901, ll. 3-6. Nor did he bring this court's attention to any intended but omitted instructions when the jury was actually instructed. Moreover, he has not pointed to any evidence within the record in support of his theory of multiple conspiracies, which would be required to warrant that instruction being given. See United States v. Wren, 363 F.3d 654, 664 (7th Cir. 2004). Instead, the record shows that both he and Blegen advanced the theory on which the jury was instructed: withdrawal from the conspiracy. There is no basis upon which we could conclude that Blegen appropriated the decisions regarding proposed instructions without Hill's consent or at least acquiescence. As a result, Hill cannot now argue that Blegen exceeded the bounds of his authority. See McKaskle, 465 U.S. at 182, 104 S. Ct. at 953.

## CONCLUSION

Based on the foregoing analysis, Hill's motion to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255 is denied. His motions for a new trial and for recusal are also denied.

Charles P. Kocoras
Chief Judge
United States District Court

Dated: SEP 1 0 2004